*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| LARAMIE RAINER, | ) | |
| | ) | Supreme Court No. S-18027 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-13-10957 CI |
| v. | ) | |
| | ) | O P I N I O N |
| RYAN POOLE, | ) | |
| | ) | No. 7597 – May 27, 2022 |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Gregory Miller, Judge.

Appearances: John J. Sherman, Sherman Law Office, LLC, Anchorage, for Appellant. No appearance by Appellee.

Before: Winfree, Chief Justice, Maassen, Carney, Borghesan, and Henderson, Justices.

BORGHESAN, Justice.

## I.     INTRODUCTION

A superior court may not grant a motion to modify child custody unless it determines there has been a substantial change in circumstances affecting the child's best interests. In this case the superior court found a substantial change due to poor communication and one parent interfering with the other's visits. Because we lack sufficient factual findings to determine whether there was a substantial change in

circumstances or whether a lesser sanction would have ensured compliance with the court's custody order, we reverse and remand for additional findings.

## II.    FACTS AND PROCEEDINGS

Ryan Poole and Laramie Rainer had a child in June 2013. Poole and Rainer's relationship ended in late 2013. Poole was incarcerated from March 2013 to October 2014.[1]

### A.    Custody Trial And 2015 Custody Order

In December 2013, when the child was six months old and Poole was still incarcerated, Rainer filed a complaint seeking sole legal and primary physical custody. Poole filed an answer and counterclaim the following month requesting joint legal and physical custody and visitation every weekend until he was out of prison. While no custody order was in place, Poole asserted on several occasions that Rainer did not facilitate sufficient visitation with the child following the end of their relationship.

A custody trial took place in February 2015. The court found both parties on equal footing with regard to most of the statutory best interests factors.[2] On the willingness of each parent to allow a close and continuing relationship between the child and the other parent, the court found that Poole was "doing pretty well and trying to make things work" and that Rainer "could do a better job."

The court ruled that Rainer should have primary physical custody but that Poole's time with the child should be increased. It issued a custody order in March 2015 awarding joint legal custody and primary physical custody to Rainer while Poole lived

---

[1]    Rainer testified that Poole had been incarcerated from March 2012 to October 2014, but testimony was otherwise consistent that Poole was incarcerated for 19 months.

[2]    *See* AS 25.24.150(c) (providing factors court is to consider in determining a child's best interests in custody proceedings).

outside of Anchorage. Poole was given unsupervised visitation that gradually increased from six hours per week to one week per month. In September 2016, when the child was likely to begin preschool, Poole's visits were to decrease to two consecutive overnights every other week.

**B.  2018 Custody Order**

In November 2017 Poole moved to enforce the court's March 2015 order. He claimed that despite attempting to contact Rainer to set up visitation, Rainer had ignored his messages and calls since March 2015 and, as a result, he had seen his child only twice since the March 2015 court order. In addition to enforcement, Poole requested "full custody, due to proof that Laramie Rainer is using drugs," and wanted Rainer to be drug tested and required to have supervised visitation. The court denied Poole's motion without prejudice, noting Poole had not explained what "proof" he had of Rainer using drugs.

In September 2018 Poole again moved to enforce the March 2015 order. He claimed that "multiple phone calls and text messages were sent to Laramie Rainer regarding visitation of our son" but that "only two visitation[]s were successful" since the order. He again requested full custody "due to the mother not possessing physical custody of their child due to drug addiction." He stated that the child was living with Rainer's parents full time and that Rainer's parents were also unwilling to adhere to the custody order.

In November Rainer and Poole reached a settlement agreement stating that they had "agreed to an updated progressive physical custody plan, similar to the one laid out in the 2015 order." Poole's custody would increase from one day a week to alternating weekend custody. He also had the option to exercise a weekly dinner with the child on Tuesday evenings. The parties submitted a proposed child custody modification order reflecting the agreement, which the court signed in December 2018.

## C.    2020 Motion To Modify

In June 2020 Poole moved to modify physical custody.  He requested primary custody, alleging that he could "provide a more stable environment" than Rainer.  Poole alleged that he had his own house, vehicle, and driver's license, whereas Rainer did not have a vehicle or driver's license, had not been employed for the last two years, and had recently moved in with her parents.  He further alleged that Rainer's "poor communication" had caused him to miss the opportunity to speak with the child on the phone and to miss a designated visitation day.

Rainer opposed, arguing that Poole had failed to show a substantial change of circumstances and that the requested custody modification was not in the child's best interest.  She also claimed that she did have a car and driver's license, that Poole had failed to exercise his full visitation under the 2018 custody order, and that she had been working odd jobs for the past year but had difficulty finding regular employment due to the COVID-19 pandemic.  Poole filed a two-sentence reply claiming that Rainer's opposition contained "false" contentions and requesting a hearing.

In August the court issued a notice of intent to rule on Poole's motion, informing the parties it would likely deny the motion, prompting Poole to file a longer reply. In this reply, Poole discussed events from throughout the parties' relationship and again claimed that Rainer had been unemployed for two years and "continued to make excuses regarding not being able to answer phone calls or text messages."  Rainer filed a sur-reply arguing that Poole had still failed to allege a change in circumstance.

## D.    Custody Modification Hearing

Instead of ruling directly on Poole's motion, the court held a hearing on Poole's motion over three days in late 2020 and early 2021.  The parties testified about a number of incidents that Poole asserted were violations of the terms of the existing custody order.

-4-                                                      7597

First, they testified about a dispute on Christmas Eve 2019. Under the custody agreement in effect, the child was to spend Christmas (which fell on a Wednesday in 2019) with Rainer and otherwise follow the normal alternating weekend schedule, which gave Poole custody on the weekend before Christmas. Poole testified that he asked Rainer to allow him to keep their child until Christmas Eve — more time than provided under the custody order — and that she initially agreed but showed up at Poole's house with her mother and boyfriend on Monday, December 23 seeking custody. Poole called the authorities, who determined the child should leave with Rainer. Rainer testified, meanwhile, that she had agreed to their child staying with Poole a bit longer but that she later realized that she and Poole were not on the same page about how long they had agreed to extend the visit.

Next the parties testified about an annual out-of-state trip taken by Rainer's family. The custody agreement permits the parents to travel out of Alaska with the child during their custodial time and states that "[i]n November, [Rainer]'s family traditionally takes [the child] on a vacation. [Poole] understands and respects this tradition and shall make a good faith effort to accommodate that trip." The order instructs that the parents "shall make good faith efforts to cooperate and accommodate trips and events with the other parent" in the event that trips fall outside their custodial time, but that absent such cooperation the custody agreement strictly controls. At least a month before the trip in 2020, Poole told Rainer that he did not want the child to be taken out of state, but Rainer sent him on the trip with his grandparents. Rainer testified that she had given Poole over 30 days' prior notice, that the trip did not occur during Poole's custodial time, and that Poole never explained why he did not want the child to go.

Finally, the parties testified briefly about a dispute stemming from school holidays. Under the custody order, if the child has a three-day weekend off from school that falls on Poole's visitation weekend, Poole may have custody for all three days.

Poole testified that on occasion he asked Rainer if their child had a day off but Rainer did not respond, and consequently Poole missed the opportunity to have a long weekend with their child. Poole admits he did not look online to see if he had the day off, but maintained that he had asked Rainer a couple of days in advance. Poole therefore contended that Rainer had denied him visitation. He testified that this had happened "more than two or three times."

### E. Superior Court Decision

After the close of testimony, the superior court made its decision on the record. First the court considered whether Poole had shown a substantial change in circumstances. The court stated that the current custody agreement "is simply not working, [] there's no meaningful communication. That seems to be undisputed. . . . There's alleged frustrated visits, frustrated as in didn't happen." It concluded that there was "clearly a substantial change that ha[d] been shown in order to have this hearing and to make this decision."

The court then considered the child's best interests, focusing on what it believed to be the two most relevant factors. First, the court examined the fifth factor, "the length of time the child has lived in a stable, satisfactory environment and the desirability of maintaining continuity."[3] The court explained that it was required to conduct a "symmetrical analysis as to this fifth factor," under which it "consider[ed] the effect that not living in one household or the other would have on the continuity and stability in the child's life." The court said that it was hard to tell if the child would "do worse under one roof versus the other." However, "the continuity factor right now is not good. The desirability of maintaining this situation is not appropriate. It's not justified, is not in [the child]'s best interest. Something needs to change." The court stated that

---

[3] *See* AS 25.24.150(c)(5).

regarding the fifth factor, Poole "comes out just slightly ahead on this because of what I've said. The situation now isn't working well and won't work well in the future from the evidence."

The court then turned to the sixth factor — communication between the parents,[4] which the court reasoned was the most important factor — and summarized the parents' conflicting testimony about whether Rainer had refused to allow Poole to exercise his visitation or whether Poole had failed to do so. The court stated that the evidence "does not permit this court to figure out exactly who had what visits when and why they didn't happen. This court absolutely can conclude and does conclude that the visits, for whatever reason, have not been occurring with the frequency and the ease that all would be in [the child]'s best interest."

Noting on multiple occasions that it found Poole "very credible," the court explained there were ten instances when it found Rainer "not to be credible" due to inconsistent testimony. The court agreed with Rainer's assessment that 50/50 custody would not be appropriate because of the stressful effects of the transitions. The court stated that the "communication, the fostering [of] the relationship, all of which is factor number six, wasn't happening. And I am finding that it's . . . more a one-sided affair than not," implying that Rainer was primarily to blame.

The court laid out three options: (1) maintaining the status quo, which it called "untenable" because the parents were "not communicating"; (2) decreasing Poole's visitation time, which it concluded would not work because "[t]he communication is going the wrong direction" and was similar to the status quo; and (3) switching primary custody to Poole. The court ordered the third option, finding it to be "in [the child]'s best interest for all the reasons I've said. A lot of it does come down

---

[4]     *See* AS 25.24.150(c)(6).

to credibility." It instructed Poole to facilitate their child's relationship with Rainer, noting that "one of the reasons that I'm making this decision in this direction is that I think you do understand that. I do not think that Ms. Rainer will get that message. I do think you will."

The court opted not to determine the details of the visitation schedule, telling the parties "to try to figure that out and file something." The parties submitted competing custody plans, and the court signed the final order in March 2021.

Rainer appeals, arguing that there was no substantial change in circumstances justifying custody modification and that the superior court erred in its best interests analysis. Poole elected not to participate in the appeal.

## III. STANDARDS OF REVIEW

"We review a trial court's child custody modification decision deferentially, reversing the decision only when the lower court abused its discretion or when its controlling findings of fact were clearly erroneous."[5] "The court's broad discretion extends to its determination whether, following an evidentiary hearing, the moving party has proven a substantial change in circumstances, meaning one that affects the child's welfare."[6] "Whether there are sufficient findings for informed appellate review is a question of law."[7]

---

[5] *Collier v. Harris*, 377 P.3d 15, 20 (Alaska 2016) (quoting *McLane v. Paul*, 189 P.3d 1039, 1042 (Alaska 2008)).

[6] *Id*.

[7] *Horne v. Touhakis*, 356 P.3d 280, 282 (Alaska 2015) (quoting *Hooper v. Hooper*, 188 P.3d 681, 685 (Alaska 2008)).

## IV. DISCUSSION

### A. The Superior Court May Not Modify A Custody Order Absent A Substantial Change In Circumstances.

The superior court found a substantial change in circumstances due to poor communication and its effect on visitation. Although these problems can be the basis for a finding of substantial change in circumstances, we reverse because the superior court did not make sufficient factual findings to permit appellate review. The superior court did not make findings about whether poor communication between the parents was actually a change, how serious the problem of missed visitation was, or whether the problem of poor communication leading to missed visits could be addressed with a less disruptive remedy than modifying custody. We therefore remand for additional findings applying the principles outlined in this opinion.

#### 1. Whether there is a substantial change must generally be determined by comparing present circumstances against those that existed at the time of the most recent custody order.

The superior court may not grant a motion to modify a child custody order unless it finds a substantial change of circumstances.[8] This requirement " 'is intended to discourage continual relitigation of custody decisions,' a policy motivated by 'the judicial assumption that finality and certainty in custody matters are critical to the child's emotional welfare.' "[9] "A change in circumstances is unlikely to be substantial enough to 'overcome our deep reluctance to shuttle children back and forth between parents'

---

[8] AS 25.20.110(a); *see also*, *e.g.*, *Geldermann v. Geldermann*, 428 P.3d 477, 482-83 (Alaska 2018); *Collier*, 377 P.3d at 20-23; *Kelly v. Joseph*, 46 P.3d 1014, 1017-18 (Alaska 2002) ("We have previously held that "[a]ctions by a custodial parent which substantially interfere with the noncustodial parent's visitation rights '[are] sufficient to constitute a change [in circumstances].' " (alterations in original) (quotation omitted)).

[9] *Peterson v. Swarthout*, 214 P.3d 332, 340-41 (Alaska 2009) (quoting *Gratrix v. Gratrix*, 652 P.2d 76, 82-83 (Alaska 1982)).

unless the change affects the children's welfare and 'reflect[s] more than mere passage of time.' "[10]

The applicable statute "does not specify what must be shown to demonstrate a change in circumstances."[11] Generally, superior courts must compare current circumstances to a "baseline" at the time of the most recent custody order — i.e. "the facts and circumstances that existed at the time of the prior custody order that the party seeks to modify"[12] — to determine if modification is warranted. If current circumstances are similar to those at the time of the most recent custody order, no substantial change has occurred and the court must decline the modification request.[13]

The need to show a change of circumstances from the previous baseline generally applies to the issue of communication between the parents. For example, in *Moore v. McGillis* a mother moved to modify a court order granting primary custody of a child to the father, alleging among other things problems communicating with the father.[14] The superior court rejected this allegation as the basis for a change in

---

[10]     *Collier*, 377 P.3d at 22 (alteration in original) (quoting *Hope P. v. Flynn G.*, 355 P.3d 559, 565 (Alaska 2015)).

[11]     *Kelly*, 46 P.3d at 1017.

[12]     *Jenkins v. Handel*, 10 P.3d 586, 589 (Alaska 2000).

[13]     *See, e.g.*, *Peterson*, 214 P.3d at 341 (holding that parents' inability to cooperate did not amount to a change in circumstances because such issues were the impetus for previous custody order); *John B. v. Alisa B.*, S-17633, 2021 WL 487121, at *4 (Alaska Feb. 10, 2021) (unpublished) (holding that mother's interference with children's therapy did not amount to a change of circumstances because superior court addressed the interference at modification hearing leading to its previous order).

[14]     408 P.3d 1196, 1199 (Alaska 2018).

circumstances, finding the communication issues were "nothing new."[15] We agreed: the parties "had testified at the original custody trial to similar communication problems" and the mother "had not shown sufficient negative impact on her daughter to warrant modification of the existing custody arrangement."[16] Similarly, in *Peterson v. Swarthout* a mother alleged that a father's "fail[ure] to communicate with her" constituted a change in circumstances.[17] But the "inability to engage in cooperative communication and decision-making" she cited had already been factored into the superior court's previous custody order, so continued communication problems did not amount to a substantial change in circumstances that warranted modifying custody.[18]

### 2. Conduct that interferes with a parent's rights under the custody order may establish a substantial change in circumstances even if there was similar conduct in the past.

"[A]ctions by a custodial parent which substantially interfere with the noncustodial parent's visitation rights '[are] sufficient to constitute a change [in circumstances].' "[19] Although "alleged violations of court custody orders do not

---

[15]    *Id*.

[16]    *Id*. at 1202.

[17]    214 P.3d at 341.

[18]    *Id*.; *see also Jennifer L. v. Geoffrey G.*, S-17698, 2021 WL 1997665, at *5 (Alaska May 19, 2021) (unpublished) (declining to find poor communication was a change in circumstances because it "d[id] not appear to be new," as previous custody order stated that parents were "[unable] or unwilling[] to communicate on a responsible level about their children").

[19]    *Kelly v. Joseph*, 46 P.3d 1014, 1017 (Alaska 2002) (second and third alterations in original) (quoting *Hermosillo v. Hermosillo*, 797 P.2d 1206, 1209 (Alaska 1990)).

necessarily constitute grounds for modification, . . . they certainly can if the violations are continuous, repetitious, or egregious."[20]

Sufficiently persistent or severe violations can justify modification even if the parent's conduct does not differ substantially from his conduct prior to adoption of the most recent custody order — in other words, even if the offending parent has previously interfered with the other's custody rights. If a parent ignores a previous custody order and then continues to ignore a new custody order, the parent's actions may justify modification — despite the fact that the parent's actions are nothing new.

We applied this principle in *Georgette S.B. v. Scott B.* when the superior court's custody order required the parents to enroll their children in therapy.[21] Eight months later the father moved to modify the custody order because, among other issues, the mother had failed to allow the children to participate in therapy.[22] The court declined to modify custody, noting its "displeasure" with the mother's "failure to support the children's therapy" and giving the parties "one more chance to cooperate."[23] Over a year after his first motion, the father again sought modification due to the mother's continued interference with the children's therapy; this time, the court granted his motion.[24] The mother appealed, arguing there was no change in circumstances "because her dissatisfaction with the children's therapy preexisted the immediately preceding custody

---

[20]     *Collier v. Harris*, 261 P.3d 397, 406 (Alaska 2011).

[21]     433 P.3d 1165, 1167 (Alaska 2018).

[22]     *Id*.

[23]     *Id*.

[24]     *Id*. at 1167-68.

order."[25] We rejected that argument, explaining that "alleged violations of court custody orders" can constitute grounds for modifications "if the violations are continuous, repetitious, or egregious."[26] We therefore affirmed the superior court's decision to modify custody.[27]

This approach to custody order violations is, perhaps counterintuitively, consistent with the "change in circumstances" requirement. When a court issues a custody order, it is presumed that the parties will follow it. A relevant baseline for the change in circumstances analysis is the assumption that each parent will receive the custody and visitation provided for in the order, because that is what the court has decided is best for the child. If one parent acts in a way that hinders the other's rights under the custody order, that represents a change from the baseline that affects the child's well-being. That is so even if the offending parent interfered with the other's rights under the previous custody order; the court, in fashioning a new order, may reasonably assume that it will be followed. Therefore, failure to follow the order is a change in circumstances that can justify modification, even if the conduct itself is nothing new. It would be poor policy indeed to lock parents into a custody arrangement when one parent interferes with the other's custody rights, just because the offending parent has always done so.

This principle applies to all conduct that interferes with parents' rights under the custody order, including parents' communication difficulties. As noted above, poor communication alone does not justify modification if the parents have always communicated poorly with one another. But when a parent is denied their visitation or

---

[25]     *Id*. at 1170.

[26]     *Id*. (quoting *Collier v. Harris*, 261 P.3d 397, 406 (Alaska 2011)).

[27]     *Id*. at 1170-71.

custody rights due to poor communication between the parties, then poor communication can be the basis for modifying custody even if it is nothing new.[28]

### 3. Courts must consider lesser sanctions for noncompliance with the custody order before modifying custody.

However, one parent's interference with the other's rights under the custody order (whether the result of poor communication or other conduct) justifies modification only if a lesser sanction will not be enough to ensure compliance with the order. In cases of noncompliance, "the appropriate use of judicial intervention is to seek an order directing the noncompliant party to comply," although noncompliance can justify modification if it is significant enough.[29] Due to "deep reluctance to shuttle children back and forth between parents,"[30] we have expressed a "preference for motions seeking compliance" — which "ha[ve] the advantage of providing a remedy without

---

[28] *See Riggs v. Coonradt*, 335 P.3d 1103, 1106-07 (Alaska 2014) (holding "evidence that the parents could not effectively communicate" including "a complete breakdown in communication . . . making joint legal custody impracticable and injurious to the children's overall well-being" sufficient to modify custody); *T.M.C. v. S.A.C.*, 858 P.2d 315, 319 (Alaska 1993) ("Sustained noncooperation between the spouses is grounds for denying joint custody [in a modification proceeding], because lack of cooperation hinders good communication in the best interests of the child.").

[29] *Peterson v. Swarthout*, 214 P.3d 332, 341 n.28 (Alaska 2009) (citing *Vachon v. Pugliese*, 931 P.2d 371, 378-79 (Alaska 1996)); *see also Collier*, 261 P.3d at 406 ("[A]lleged violations of court custody orders do not necessarily constitute grounds for modification, although they certainly can if the violations are continuous, repetitious, or egregious.").

[30] *Harrington v. Jordan*, 984 P.2d 1, 4 (Alaska 1999) (quoting *C.R.B. v. C.C.*, 959 P.2d 375, 381 (Alaska 1998), *overruled on other grounds by Evans v. McTaggart*, 88 P.3d 1078, 1085 (Alaska 2004)).

risking disruption to the child" — over motions to modify custody.[31] Therefore, before granting a motion to modify a custody order based on allegations of noncompliance with its terms, the superior court must expressly determine whether a lesser sanction will suffice to ensure compliance with the arrangement that the court has already determined is in the child's best interests. In doing so, the court must consider whether the offending parent's conduct is "continuous, repetitious, or egregious."[32]

### B.    We Lack Sufficient Findings To Review The Determination Of A Substantial Change In Circumstances.

Applying these principles to Rainer's appeal, we conclude that the superior court did not make sufficient factual findings for us to review its ruling that a substantial change in circumstances occurred. Although the superior court made some findings about poor communication and missed visits, its findings do not indicate whether these facts represent a change in circumstances, whether the communication issues resulting in missed visits are continuous or egregious enough to warrant modification, and whether a lesser sanction would suffice to ensure compliance with the existing custody order.

In its brief findings regarding the change in circumstances, the superior court noted that it is "undisputed" that there is "no meaningful communication" between Rainer and Poole and that there were missed visits.[33] To be sure, the record reveals the parties have substantial communication problems — and have had similar problems

---

[31]    *Collier*, 261 P.3d at 406.

[32]    *Id.*

[33]    We note that in response to questions from the superior court, Poole agreed that communications to facilitate custody exchanges had "been working out okay" and that he and Rainer were starting to "communicate fairly well." But given other testimony in the record, we cannot say the court's finding that there was "no meaningful communication" between the parties is clearly erroneous.

throughout the life of this case.  The court cited communication and visitation issues "going back to 2015 and 2016" in its decision, raising the question of whether it considered this conduct — which predated the existing custody order — in its decision. And the court made no specific factual findings to support the conclusion that poor communication and missed visits were a change in circumstances from those that existed prior to adoption of the existing custody order.

Although the superior court indicated in its best interests analysis that the communication problems led to Poole missing some visitation, the court did not make findings on whether the interference with Poole's visitation rights was "continuous, repetitious, or egregious."  Nor did the court expressly consider whether a lesser sanction than modifying the custody arrangement would have sufficed to ensure compliance.  The court explained its decision largely by stating that "[a] lot of it does come down to credibility" and repeatedly found Poole to be more credible than Rainer.  But a credibility finding is not a substitute for clear findings of fact on the conduct or circumstances that amount to a substantial change in circumstances.  Lacking clear findings, we must remand.[34]

Although we remand due to legal error, we also make some observations about the superior court's factual findings to the extent they pertain to the change in circumstances analysis.  Our observations relate to three incidents:  (1) Christmas Eve 2019; (2) the out-of-state trip on which Rainer's parents took the child; and (3) missed visitation on school holidays.

---

[34] *See Horne v. Touhakis*, 356 P.3d 280, 282 (Alaska 2015) ("Whether there are sufficient findings for informed appellate review is a question of law.") (quoting *Hooper v. Hooper*, 188 P.3d 681, 685 (Alaska 2008)).

### 1. Christmas Eve 2019

Under the custody agreement, the child was to stay with Poole from Friday evening on December 20 until 6 p.m. on Sunday, December 22. Poole testified that he asked Rainer to extend his custody of their child until Christmas Eve and that she "originally said yes." Poole then testified that Rainer, Rainer's mother, and Rainer's boyfriend came to the house on Monday, December 23 and "started yelling" before Poole called troopers to the house. The superior court found Poole "very sincere, very credible" in recounting this story and appears to have factored the incident into its decision.

But Poole's testimony was inconsistent. While he testified that Rainer initially agreed to extend his custody until Christmas Eve, the superior court noted that Poole "testified that he asked one week before for a change in the time, that Ms. Rainer ignored him several times, ignored his several requests." The court did not address this contradiction, but noted that "there was a mistake by the Rainers in interpreting [the custody] agreement and going on the property." If Rainer had ignored Poole's requests to change the pickup time as he testified, Rainer did not make any mistake, as she was entitled to custody at that time under the agreement. The court's own findings are unclear about what, precisely, it believed happened during the Christmas Eve incident.

### 2. The out-of-state trip

In discussing the out-of-state trip, the superior court found that Rainer "just sent [the child] with her parents, even though Mr. Poole had said no." Although "[t]here was much testimony" questioning whether Poole's denial was in good faith, the court noted there was little testimony about why Poole denied it. The court suggested the issue was "a lack of communication between the parents," and concluded that Rainer, by sending their child on the trip over Poole's objection, was engaging in unlawful "self-help."

The custody order provides that "[b]oth parties shall be able to travel outside Alaska with [the child] during their custodial time." Should the parents be unable to communicate about trips that fall outside of their custodial time, the custody agreement must be "strictly followed." The agreement expressly contemplates the annual out-of-state trip in a separate provision, noting that Poole "understands and respects this tradition and shall make a good faith effort to accommodate" it. While Poole told Rainer he did not want the child to go on the trip, Rainer testified that she gave Poole more than 30 days' notice — more than the 14 days required by the custody order — and Poole's visitation was not affected by the trip.

A potential issue is that Rainer did not join her parents for the trip due to court dates in this case that were scheduled after the trip was already planned. Because the custody order may be read to permit the child's out-of-state travel only if he is accompanied by a parent,[35] the court's finding that Rainer engaged in self-help when she sent the child on the trip with his grandparents without seeking court permission first is not unfounded. Even so, the trip did not interfere with Poole's visitation, and Poole's unexplained refusal to allow their child to go on a trip with his grandparents that is expressly contemplated in the custody agreement raises questions about his own compliance with the agreement. These facts must be considered in deciding whether poor communication justifies modification of custody.

### 3. School holidays

Finally, the court found that "[f]or school pick-up and holidays [Poole] testified that Ms. Rainer wouldn't respond to his various inquiries regarding school holidays and she would often just keep [the child]." Poole testified that this had

---

[35] We express no opinion about whether this is in fact the correct interpretation of this term in the custody agreement.

happened "more than two or three times." As one example, Poole testified that he asked Rainer in advance if the child had the day off and Rainer did not respond, even though the child did not have school that day. Under the custody order, Poole was entitled to custody of their child that day. Notably, Poole acknowledged he could access the publicly available school district calendar online but admitted he did not do so in this case to determine whether the child had the day off. The relevant question for the superior court is whether Rainer's failure to inform Poole when school holidays were is a substantial enough interference with Poole's visitation rights that it cannot be cured by a lesser sanction than modification.

## V.    CONCLUSION

We VACATE the superior court's order modifying custody and REMAND this case for further proceedings consistent with this opinion.